IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

No. 26-1233

---

EVAN BEINE and MICHELLE BEINE,

Plaintiffs-Appellants,

v.

CHILDREN'S HOSPITAL AND HEALTH SYSTEM, INC.,
CHILDREN'S HOSPITAL OF WISCONSIN, INC.,
THE MEDICAL COLLEGE OF WISCONSIN, INC.,
HILLARY W. PETSKA, M.D., MICHAEL N. LEVAS, M.D.,
KEVIN P. BOYD, D.O., MATTHEW R. PLUNK, M.D.,
HEATHER L. MARSCHALL, N.P., AND
DEBORAH A. BRETL, N.P.,

Defendants-Appellees.

---

APPEAL FROM THE JUDGMENT AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' AMENDED COMPLAINT ON JANUARY 8, 2026, IN THE EASTERN DISTRICT OF WISCONSIN, THE HONORABLE STEPHEN C. DRIES, UNITED STATES MAGISTRATE JUDGE, PRESIDING

---

# INITIAL BRIEF OF PLAINTIFFS-APPELLANTS
CIVIL APPEAL

---

NICOLE M. MASNICA
Wisconsin State Bar No. 1079819
ZACHARY T. WROBLEWSKI
Wisconsin State Bar No. 1119194
Gimbel Reilly Guerin & Brown LLP
330 E. Kilbourn Ave., Suite 1170
Milwaukee, WI 53202
Tel: 414-271-1440
Attorneys for the Plaintiffs-Appellants

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

No. 26-1233

---

EVAN BEINE and MICHELLE BEINE,
Plaintiffs-Appellants,

v.

CHILDREN'S HOSPITAL AND HEALTH SYSTEM, INC.,
CHILDREN'S HOSPITAL OF WISCONSIN, INC.,
THE MEDICAL COLLEGE OF WISCONSIN, INC.,
HILLARY W. PETSKA, M.D., MICHAEL N. LEVAS, M.D.,
KEVIN P. BOYD, D.O., MATTHEW R. PLUNK, M.D.,
HEATHER L. MARSCHALL, N.P., AND
DEBORAH A. BRETL, N.P.,
Defendants-Appellees.

---

# PLAINTIFF-APPELLANT'S RULE 26.1 DISCLOSURE STATEMENT

---

The undersigned, counsel for Plaintiff-Appellants Evan Beine and Michelle Beine, furnishes the following pursuant to Circuit Court Rule 26.1:

1) Plaintiff-Appellants are Evan Beine and Michelle Beine.

2) Plaintiff-Appellants Evan Beine and Michelle Beine are individuals.

3) The name and address of the law firm and individuals representing Plaintiff-Appellants Evan Beine and Michelle Beine are:

Nicole M. Masnica *(Counsel of record)*
Zachary T. Wroblewski
GIMBEL, REILLY, GUERIN & BROWN LLP
330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
Telephone: 414/271-1440; Facsimile: 414/271-7680
E-mail: nmasnica@grgblaw.com; zwroblewski@grgblaw.com

Dated: March 26, 2026

/s/Nicole M. Masnica
NICOLE M. MASNICA

## TABLE OF CONTENTS


**PAGE**

TABLE OF AUTHORITIES ........ v

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF THE ISSUES FOR REVIEW ........ 2

STANDARD OF REVIEW ........ 24

SUMMARY OF ARGUMENT ........ 25

ARGUMENT ........ 26

I. The District Court erred when granted it the defendants' Rule 12(b)(6) motion to dismiss the amended complaint on the grounds that the action was untimely and commenced after the statute of limitations had run. ........ 26

A. The propriety of dismissal of a complaint pursuant to Rule 12(b)(6) ........ 26

. The Beines' claims were properly pled in the amended complaint and dismissal pursuant to a Rule 12(b)(6) motion on statute of limitations runs afoul of well-established law and was unsupported by the amended complaint ........ 28

1. Dismissal pursuant to Rule 12(b)(6) was improper as the amended complaint sets forth sufficient facts and allegations that demonstrate the Beines' claims were not perfected until mid-2022 at the earliest, as they were unaware of the "cause" of the harm incurred until that time ........ 29

2. The determination that the statute of limitations began to run at the time child protective services closed its investigation was arbitrary and unsupported by the allegations set forth in the amended complaint ........ 32

3. The public policy concerns of the district court are unfounded and contrary to this Court's holding in other cases ........................................39

CONCLUSION .................................................................................................... 41

CERTIFICATION AS TO FORM AND LENGTH ..................................................................42

APPENDIX..........................................................................................................100

CERTIFICATION AS TO APPENDIX...........................................................................117

## TABLE OF AUTHORITIES

### *Cases*

**PAGE**

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)....................32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)....................24, 32, 33

*Cancer Foundation, Inc. v. Cerberus Capital Management, LP*,
599 F.3d 671 (7th Cir. 2009)....................26, 27

*Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*,
770 F.3d 610 (7th Cir. 2014)....................27

*Cielak v. Nicolet Union High School District*,
112 F.4th 472 (7th Cir. 2024)....................27, 29

*Clark v. City of Braidwood*,
318 F.3d 764 (7th Cir. 2003)....................27

*Clark v. Erdmann*,
161 Wis. 2d 428, 468 N.W.2d 19 (1991)....................35

*Claypool v. Levin*,
562 N.W.2d 584 (Wis. 1997)....................24, 35

*Early v. Bankers Life & Cas. Co.*,
959 F.2d 75 (7th Cir. 1992)....................27

*Frechette v. Ravn*,
145 Wis. 589, 590, 130 N.W. 453 (1911)....................32

*Heck v. Humphrey*,
512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994)....................40, 41

*Hernandez v. City of Goshen, Indiana*,
324 F.3d 535 (7th Cir. 2003)....................25

*Hollander v. Brown*,
457 F.3d 688 (7th Cir. 2006)....................27

*McDonough v. Smith*,
588 U.S. 109, 139 S. Ct. 2149, 204 L. Ed. 2d 506 (2019)....................40

*Milchtein v. Milwaukee County*,
42 F.4th 814 (7th Cir. 2022) ........................................................................24, 25

*Monell v. Department of Social Services*,
436 U.S. 658 (1978)........................................................................................29

*O'Gorman v. City of Chicago*,
777 F.3d 885 (7th Cir. 2015) ........................................................................28, 38

*Sidney Hillman Health Center of Rochester v. Abbott Laboratories, Inc.*,
782 F.3d 922, (7th Cir. 2015) ..........................................................................27

*Taha v. Int'l Bhd. of Teamsters, Loc. 781*,
947 F.3d 464, (7th Cir. 2020) ..........................................................................32

*Tamminen v. Aetna Casualty & Surety Co.*,
109 Wis.2d 536, 539, 327 N.W.2d 55 (1982)...........................................31, 32

*Thompson v. Cope*,
900 F.3d 414 (7th Cir. 2018) ........................................................................24, 28

*Yeftich v. Navistar, Inc.*,
722 F.3d 911, (7th Cir. 2013) ......................................................................32, 33

### ***Statutes and Other Relevant Authorities***

**PAGE**

28 U.S.C. §1291 ...................................................................................................1

28 U.S.C. §636(c)(3) ............................................................................................1

42 U.S.C. § 1983 ........................................................................................ *passim*

Fed. R. Civ. P. 8(a)(2) ........................................................................................24

Rule 12(b)(6)............................................................................................... *passim*

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of Wisconsin had jurisdiction pursuant to 42 U.S.C. §1983 as this case was pursued by the plaintiffs as a civil action alleging multiple counts deprivation of the Beines' civil rights, specifically violations of the rights and privileges protected by the United States Constitution. The initial complaint (R. 1), which also raised Wisconsin law-based claims, was filed on March 20, 2025, with the subsequent amended complaint filed on August 8, 2025. (R. 39).

The defendants concurrently filed motions to dismiss the amended complaint pursuant to Rule 12(b)(6), and the district court issued an order granting the motions to dismiss on January 8, 2026. (R. 60). An order dismissing the action with prejudice was filed on that same date. (R. 61).

This is a direct appeal from a final judgment and order of the U.S. District Court for the Eastern District of Wisconsin. The United States Court of Appeals for the Seventh Circuit has jurisdiction over this matter pursuant to 28 U.S.C. §636(c)(3) and 28 U.S.C. §1291 as this is an appeal of the final judgment entered by a magistrate judge, ordered following the consent of the parties for the magistrate's jurisdiction. A timely notice of appeal was filed on February 4, 2026. (R. 62).

## STATEMENT OF THE ISSUES FOR REVIEW

I. Did the district court err in granting the defendants' motions to dismiss the amended complaint pursuant to Rule 12(b)(6) on the grounds that the action was untimely and commenced after the statute of limitations had expired?

## STATEMENT OF THE CASE

### I. Issues before the Court

On January 8, 2026, in response to the defendants' motions to dismiss the Beines' amended complaint pursuant to Rule 12(b)(6), the district court issued an order granting the motion to dismiss and subsequently issued a judgment of dismissal with prejudice. (R. 60, 61). The district court concluded that dismissal pursuant to Rule 12(b)(6) was necessary as the action, in the district court's view, was untimely and that the discovery rule did not support a later accrual date of any of the claims alleged by the Beines.

The Beines now appeal the decision of the district court granting defendants' motions to dismiss (R. 60) and subsequent judgment dismissing the action with prejudice (R. 61), on the grounds that the district court erred in dismissing the action at this stage in the litigation. In support of their position, the Beines allege that a dismissal pursuant to Rule 12(b)(6) was improper as the amended complaint sufficiently alleged (1) conduct on the part of the defendants sustaining each of the nine counts alleged that occurred around May 2022, within the three-years preceding the filing of the complaint and commencement of the action in March 2025; (2) that the Beines, through their counsel at that time, did not learn until a telephone call with Dr. Boyd on September 28, 2022, that he and Dr. Petska had continued to assist the Milwaukee County District Attorney's Office to pursue felony child abuse charges against Mr. Beine around May 2022 without first properly reviewing P.B.'s medical records and repeat x-rays per the standards of the child advocacy medical practice; and (3) that the Beines did not

discover what information and evidence supported the nine claims against the defendants until the receipt of opinions five other medical doctors in 2022, the final of which contained the ultimate diagnosis of a genetic disorder that led to P.B.'s injuries and was rendered in December of 2022. Thus, assessing the facts pled, the reasonable inferences drawn from those facts, and where necessary, applying the well-established discovery rule tolling the commencement of the statute of limitations, the district court's decision must be reversed and the matter remanded for further proceedings in the district court.

## II. Statement of Relevant Facts & Procedural History

### A. Relevant Factual Background Underlying this Case

#### 1. *The Beines Take Their Son to Children's Hospital of Wisconsin*

At approximately 8:30 a.m. on November 21, 2020, Evan and Michelle Beine were at home with their 5-week-old son, P.B. (R. 39:7). While Mrs. Beine was in the living room pumping breast milk to feed their son, Mr. Beine took P.B. down the hall and into his bedroom to the changing table to change his young son's diaper. (R. 39:7). During the diaper change, Mr. Beine lifted P.B.'s legs in the air so that he could clean his bottom and slide the new clean diaper beneath him. (R. 39:7). While moving his son in this manner, Mr. Beine heard a "popping sound" and P.B. began to cry. (R. 39:7). Mr. Beine immediately brought P.B. back to his wife and told her what had occurred, and they decided to call P.B.'s pediatrician at Advocate Aurora Health to inform the doctor of the sound Mr. Beine had heard. (R. 39:8).

The Beines spoke with the on-call physician who indicated that there was likely nothing wrong and that they could wait and see how things continued before bringing P.B. in for any medical treatment. (R. 39:8). The Beines, new parents to their first child, decided to take P.B. to an urgent care clinic to have him looked at and to confirm that there was nothing wrong. (R. 39:8). Once at the urgent care, the Beines were told that the facility could not treat infants that young, so they were referred to the Children's Hospital of Wisconsin Emergency Room. (R. 39:8). The Beines drove to the hospital and P.B. was taken in for treatment at the CHW's emergency department at approximately 11:32 a.m. that same morning. (R. 39:8).

Once at CHW, Registered Nurse Devon Balles was assigned to P.B.'s care to perform a pain assessment, acuity/triage, review medications and inspect two "line like" bruises on P.B.'s leg. (R. 39:8). Following RN Devon's initial assessment Dr. Levas was assigned to P.B.'s care at 12:29 p.m. (R. 39:8). Dr. Michael Levas ordered x-rays and blood work[1]. (R. 39:8). Dr. Kevin Boyd from the radiology department was assigned to the case and interpreted the x-ray results related to P.B. (R. 39:9). Dr. Boyd reported the following diagnostic interpretation of P.B.'s leg x-rays and communicated his findings to Dr. Levas:

1. Acute, oblique minimally displaced fracture of the mid left tibial diaphysis.

---

[1] Blood testing ordered by Dr. Levas revealed that P.B. had elevated parathyroid hormone levels (PTH) of 67.5, well above the normal range in infancy of 7.5 – 53.5 pg/mL. Additionally, testing revealed lower than normal Factor IX, a protease that impacts the body's ability to clot blood. The lab results likewise showed a Vitamin D deficiency. None of this information or what those abnormal tests could indicate was communicated to police.

2. Subacute appearing, healing metaphyseal corner fracture of the proximal right tibial metaphysis.
3. Additional metaphyseal fractures suggested of the medial distal right and left tibial metaphyses.

(R. 39:9).

Dr. Levas also consulted with the Child Advocacy Center at CHW, with the first contact with Nurse Practitioner Deborah Bretl beginning around 1:23 p.m., reporting there was the concern of potential child abuse. (R. 39:8). Around 2:08 p.m., Social Worker Linda Wojtasiak was assigned to P.B.'s care. (R. 39:8). Shortly after Wojtasiak became involved in the case, she contacted the Wauwatosa Police Department (at approximately 2:31 p.m.) and officers were dispatched to the hospital. (R. 39:9).

Following their arrival, officers spoke with Dr. Levas. (R. 39:9). At that time, he reported that P.B. had a "spiral" fracture, as well as three previous fractures in his legs that were now healed. (R. 39:9). Dr. Levas told police that P.B.'s injuries were not consistent with Mr. Beine's story of the diaper change, and that in his professional opinion, a large amount of force was necessary to create the four fractures he claimed were observed on P.B.'s x-rays. (R. 39:9). Based upon the report of Dr. Levas, Mr. Beine was arrested on charges of felony child abuse and the Child Advocacy Team at CHW continued its review of the case. (R. 39:10).

2. *The Child Advocacy Team Abuse Report*

After being called to join the case by Dr. Levas upon P.B.'s admission to CHW, the Child Advocacy Team began to conduct a "Child Advocacy Consultation." (R. 39:10). At no time during this consultation was P.B. seen by a member of the Child

Advocacy Team, did the team speak with either Evan or Michelle Beine to obtain a full and proper health history, nor did any member review his medical history, despite the fact the team was tasked with conducting a child abuse assessment and generating a written report to that effect. (R. 39:10). Nurse Practitioner Heather L. Lisko and Dr. Hillary Petska were assigned to the case. (R. 39:10).

At no time did the Lisko or Petska take any steps to obtain or document a complete and accurate patient and family medical history[2], and Lisko failed to correctly interpret the abnormal bloodwork, wrongly interpreting the lab results as "unremarkable". (R. 39:11) Lisko also categorically concluded that P.B. had "no indication of underlying bone disease" and incorrectly wrote in her report that the family had no documented history of bone disease. (R. 39:11)

Lisko concluded without a full and proper evaluation and investigation that P.B.'s injury were caused by nonaccidental child abuse. (R. 39:12) To support her finding, Lisko wrote the following:

> P.B. has classic metaphyseal lesions or CMLs, which are also sometimes referred to as 'corner' or 'bucket handle' fractures. This type of fracture occurs near the end of long bones (metaphysis) and usually affects younger children (e.g., infants or toddlers). The mechanism of a CML is severe force traction and/or torsion such as a 'yank and twist' to the extremity or forceful acceleration/deceleration of the extremities as might occur during violent shaking/slamming. These types

[2] Unexplored by any physician at CHW was the Beines' familial health history. Mrs. Beine did not know the relevance at the time and was never asked about these issues by CHW staff. Had they inquired with Mrs. Beine about potential bone or genetic disorders, they would have learned that she was diagnosed with scoliosis as a child and has a family history of other various bone disorders and frequent breaks in adulthood. Only after conducting her own research and working with privately hired physicians and geneticists did she learn of the importance of her and her family's health history.

> of fractures do not occur during the routine care, handling, or activity of a healthy infant. CML's are highly specific for inflicted trauma in a non-mobile child and there is no history of accidental trauma that would explain this injury. This injury is therefore highly concerning for child physical abuse.

(R. 39:12).

Lisko also wrote that the bruise on P.B.'s left leg, at the site of the long bone tibial fracture that P.B. had been taken to the hospital to the have treated that day, supported her conclusion that P.B. had been physically abused and noted that "infants with unexplained bruising are at risk for more serious injury and/or death." (R. 39:12-13). Lisko opined in her report that the dating of bruises can be difficult, and it is not recommended to determine when a bruise originally presented. (R. 39:13). Lisko reported that "infants with unexplained bruising are at risk for more serious injury and/or death. Failure to place this child in a safe environment increases the risk of further harm." (R. 39:13).

Had Lisko or CHW staff reviewed P.B.'s health records, they would have discovered that P.B. had been seen by his pediatrician seven times since his birth in the course of regular infant care, on October 7, 2020, October 12, 2020, October 13, 2020, October 19, 2020, October 30, 2020, November 9, 2020, and November 20, 2020, and not one of those examinations revealed any observed bruising or injuries to the child. (R. 39:13). Notably, the doctor's notes from the well-child check on November 20, 2020, less than 24 hours prior to the injury to the child, stated P.B.'s skin was "pink, warm, [with] no rashes, [and] no ecchymosis." (R. 39:13).

The report finally indicates that Lisko spent a total of 60 minutes reviewing P.B.'s medical records and making her findings. (R. 39:15). Dr. Petska reviewed and approved the report as Lisko is not a medical doctor. (R. 39:15). Dr. Petska did not add additional comments other than signing and stating: "I reviewed the documentation from this ED visit on 11/21/2020 and agree with the findings and recommendations as documented above." (R. 39:15). She, like Lisko, never saw P.B. or his parents. (R. 39:15).

On December 14, 2020, a second skeletal survey of P.B. was performed on December 14, 2020, by Dr. Matthew Plunk of CHW. (R. 39:15). Dr. Plunk made the following findings regarding P.B.'s new x-ray set:

1. Healing tibial fracture in similar alignment, described separately dictated radiograph.

2. Previously identified metaphyseal fracture of the right proximal tibia has decreased in conspicuity suggestive of further healing of a subacute injury.

3. Similar appearance of irregularity of the bilateral distal tibial metaphyses which remains concerning for previous metaphyseal fracture.

4. No new fracture appreciated.

(R. 39:16).

The following day, Lisko authored a follow-up report to the original in which she had concluded that P.B. had been abused. (R. 39:16). Lisko wrote that the new information revealed regarding some of the previously identified factures "[did] not impact the level of suspicion of abuse regarding the initial injury since [the repeat surveys are] performed to clarify initial injuries and detect new injuries," not with the purpose of confirming the initial diagnosis. (R. 39:16). Lisko, thus, stood by her initial

conclusion and determined "[P.B.] has been physically abused." (R. 39:16). It was noted that Lisko spent 20 minutes reviewing P.B.'s records and "discussing with providers" before generating this report and continued conclusion of "abuse." (R. 39:17). Dr. Petska again signed off on the report. (R. 39:17).

The same day as Lisko and Dr. Petska's second report, the Milwaukee County District Attorney's Office charged Mr. Beine with Felony Child Abuse – Intentionally Causing Harm, in Milwaukee County Circuit Court Case Number 2020-CF-4472, filed December 15, 2020. (R. 39:15).

3. *The Co-Occurring Child Protective Services Participation*

While the Beines and P.B. were still at the hospital on November 21, 2020, the Child Advocacy Team staff contacted Milwaukee Child Protective Services ("CPS") for immediate intervention to develop a care plan for P.B. (R. 39:18). Over the next several weeks, a CPS social worker conducted an investigation into the matter and was assigned to assist in protecting P.B. (R. 39:18). Because of the initial conclusions of CHW staff, CPS determined that the Beines could not be with P.B. unsupervised and Mr. Beine was prohibited from engaging in P.B.'s care in any capacity. (R. 39:18). Additionally, he was prohibited from having any physical contact with his son without direct CPS supervision. (R. 39:18). As a result, the Beines were forced to move in with Ms. Beine's parents to help facilitate the mandatory supervision and care for P.B. (R. 39:18).

After several weeks of monitoring by a lay case worker, CPS officially concluded that the allegations of physical abuse by Mr. Beine were unsubstantiated, a different

type of legal conclusion than that in the criminal justice system. (R. 39:19). The social worker assigned to the matter concluded that after observing Mr. Beine, "there were no safety concerns; No new present danger or impending danger threats were identified, so there was no reason to keep the case open, or refer the family for other services." (R. 39:18-19). The social worker noted that CHW testing was only "able to confirm Mr. Beine caused one break," but that in her view, the injury "was not caused intentionally or seemingly even recklessly." (R. 39:19). As a result, CPS closed its monitoring case of the Beines. (R. 39:19). This child protective services matter was separate and unrelated to the criminal matter, which the Milwaukee County District Attorney's Office continued to pursue with the assistance and participation with CHW staff. (R. 39:20).

4. *The Beines Seek a Second Opinion & Further Medical Care for P.B.*

After Mr. Beine was arrested and accused of abusing his son, the Beines began looking into whether there may be something else going on with their son that could explain why his leg was fractured during a normal diaper change. (R. 39:20). This led the couple to take their son to the nephrology department of UW Health System ("UW Health") and the American Family Children's Hospital for another opinion about what they now realized were abnormal blood results and the potential impact to the break to P.B.'s leg. (R. 39:21). Upon review of the CHW records, the physicians at UW Health noted that the x-ray report notes that there were "possible metaphyseal fractures bilaterally," but that this was "less clear" in their view. (R. 39:21). The UW Health physicians also noted that the distal metaphysis in the lower extremities were of "unclear etiology and could be normal variants" based on their appearance on repeat

scans from December 2020. (R. 39:21). The visit notes from UW Hospital also noted that P.B. had slightly blue/grey sclera of the eyes, which was noted to be a symptom of osteogenesis imperfecta, however, there were no other traditional hallmarks of the traditional osteogenesis imperfect noted at that time. (R. 39:21).

Based upon the initial review of the CHW file and an examination of P.B., the UW Health physicians concluded that there were two potential causes of the fracture sustained by P.B. from the standpoint of a medical conclusion: (1) Mr. Beine had used more force than what would typically be done in a diaper change, or (2) there was an underlying issue with P.B.'s bones that contributed to the injury. (R. 39:21). To assist in beginning to explore the latter hypothesis, the UW hospital physician ordered a blood test to check for genetic abnormalities linked to skeletal dysplasia conditions. (R. 39:22). The genetic panel revealed an intronic FN1 variant, a variant identified was associated with bone weakness, unexplained corner fractures/corner metaphyseal lesions, and osteogenesis imperfecta. (R. 39:22). It was later revealed that Mrs. Beine also has the same genetic abnormality after subsequent testing was ordered, confirming that it was an inherited genetic mutation. (R. 39:26). At the time, the treating physician, who was not a geneticist, reported that the discovery of the variant had an unknown significance and the Beines sought further medical care and opinions for their son. (R. 39:20).

Those opinions were sought from Dr. Marvin Miller, Dr. Susan Gootnick, Dr. Christopher Sullivan and Dr. Susanna Sorrentino. (R. 39:22-23, 25-26). Their reports and conclusions were received on October 5, 2021, April 18, 2022, June 8, 2022, and December 6, 2022, respectively. (R. 39:22-23, 25-26).

5. *The Opinion of Dr. Marvin Miller, Department of Medical Genetics & Birth Defects at Dayton Children's Hospital*

To assist in treating their son, the Beines requested a second-opinion from Marvin Miller, M.D. ("Dr. Miller"), a Yale-trained pediatric geneticist who is board-certified in the fields of pediatrics and medical genetics employed at Dayton Children's Hospital. (R. 39:23). Dr. Miller was known to conduct research on pediatrics, bone disorders, pediatric and maternal genetics and as well as a variety of other topics. (R. 39:24). Dr. Miller prepared a report containing his own medical conclusions. (R. 39:24). In doing so, he reviewed the medical records of both P.B and Mrs. Beine. (R. 39:24). Dr. Miller noted that in the records from P.B.'s pediatrician, there were no bruises or signs of child abuse reported on any previous well checks during any of the seven visits in his five-weeks of life. (R. 39:24).

Dr. Miller also made note that the subsequent testing conducted by U.W. Health determined that P.B. was identified to have a genetic bone abnormality on the Invitae 150 Gene Panel, though the significance of that abnormality was unknown at that time. (R. 39:24). Based on his observations, Dr. Miller opined that there were several identifying characteristics of metabolic bone disease presented when P.B. was admitted to the hospital in November 2020 and during the repeat scans in December 2020 that were ignored by the practitioners, including:

a) "Bone in bone" presentation of the vertebrae
b) Cupped ribs
c) Sclerosis of proximal femurs
d) Healing of a CML with no callus formation

(R. 39:24).

Dr. Miller also pointed out in addition to Lisko flatly ignoring this diagnostically relevant information in making her report and conclusions, she also made conclusions that were contrary to P.B.'s medical records. (R. 39:24). Dr. Miller pointed out that while she generally opined: "CML fractures associated with birth injury are generally only seen in traumatic deliveries of large for gestational [age] infants" and that would not apply to P.B., the child was in fact large for gestational age and weighed nearly 10 pounds at birth. (R. 39:24).

Dr. Miller took issue with Lisko's definitive conclusion that P.B. "has been physically abused," pointing out that Lisko's "diagnosis" was apparently based solely on the conclusion that there were three alleged CMLs/corner fractures identified by Dr. Boyd, despite the fact that medical treatises demonstrate these abnormalities are not specific for trauma or child abuse and can in fact be signs of metabolic bone disease in infancy. (R. 39:24-25).

6. *The Opinion of Dr. Susan Gootnick, Board Certified Radiologist Since 1977*

The Beines retained Susan Gootnick, M.D. ("Dr. Gootnick"), a board-certified radiologist with more than 48 years of diagnostic and teaching experience, to review the conclusions of CHW staff. (R. 39:25). In reviewing the case and preparing a written conclusion, Dr. Gootnick reviewed the reports from CHW, as well as P.B. and Ms. Beine's medical history in preparation of forming her opinion. (R. 39:25). Dr. Gootnick detailed in her report on, drafted April 18, 2022, that P.B. was born at nearly ten pounds to a mother with notably low vitamin D levels, indicators for the potential for bone

weakness and potential breaks during the birthing process. (R. 39:25). She also concluded that the skeletal survey revealed evidence consistent with metabolic bone disease in infancy. (R. 39:25).

Dr. Gootnick opined that the CMLs/corner fractures identified previously as "fractures" were not fractures but instead evidence of a metabolic bone disease or healing from rickets (non-specific weak bones). (R. 39:25). Dr. Gootnick concluded that "there is no evidence of child abuse but there is extensive radiographic evidence of metabolic bone disease most commonly rickets in the neonatal period." (R. 39:25).

7. *CHW Staff Assists the Prosecution Again around May 2022*

Following receipt of the medical conclusions and reports from UW Hospital, Dr. Miller, Dr. Gootnick, and the conclusions of CPS[3], the Beines, through counsel, provided that information to the Milwaukee County District Attorney's Office, who in turn was continuing to consult and work with CHW staff, specifically Dr. Petska and Dr. Boyd, to obtain additional medical opinions. (R. 39:27-28). Despite the opinions of several experts highlighting that the appropriate alternative hypothesis of a potential underlying bone disorder had not been appropriately considered or investigated by CHW and its staff, and the CPS investigation into Mr. Beine's general demeanor and parenting skills, Dr. Petska and Dr. Boyd doubled down on their conclusion that Mr. Beine had physically abused his son, P.B., as communicated in a May 4, 2022, electronic

[3] Dr. Sullivan's report came in June 2022 and Dr. Sorrentino's in December 2022, and both were turned over to the upon receipt in an attempt to dispute the new, incorrect and (continued)

communication from the assigned prosecutor stating that she had spoken with Dr. Petska and Dr. Boyd about the expert reports and CPS investigation and they were not changing their opinion regarding the child abuse conclusion and initial identification of the injuries. (R.39:28). The prosecutor also provided Mr. Beine's counsel in that email with a demonstrative exhibit created by Dr. Petska and Dr. Boyd challenging the new medical opinions which called into question the determination that the long bone fracture was specific for abuse and that the other previously identified corner fractures were even fractures to begin with. (R. 39:28-29).

The prosecutor confirmed in this email that both Dr. Petska and Dr. Boyd had provided her with a new opinion that Mr. Beine must have abused his son, and they both believed the conclusions of the other doctors that they had missed or improperly disregarded evidence on the x-rays and bloodwork that indicated another underlying cause of the fracture and corner abnormalities were incorrect. (R. 39:29). At that time, the prosecution maintained its position that Mr. Beine was guilty of intentionally abusing his son and that a prison resolution was the only appropriate outcome. (R. 39:30).

8. *The Opinion of Dr. Christopher Sullivan, Director of Pediatric Orthopedics and Scoliosis at Comer Children's Hospital, The University of Chicago Medicine*

In April 2022, just ahead of the e-mail from the prosecution, the Beines had sought another medical opinion from a pediatric orthopedic surgeon, Dr. Christopher

---

misinformed medical conclusions provided by Dr. Petska and Dr. Boyd to the prosecution (continued)

Sullivan, M.D. ("Dr. Sullivan"). (R. 39:22). Dr. Sullivan is a board-certified orthopedic surgeon of the Pediatric Orthopedic Society of North America, practicing out of The University of Chicago Medicine Comer Children's Hospital. (R. 39:22). In conducting the review of P.B.'s case, Dr. Sullivan reviewed all of P.B.'s medical records and the initial conclusions from CHW staff. (R. 39:22-23).

On June 8, 2022, Dr. Sullivan composed a report and an associated PowerPoint presentation, detailing how the "injuries" identified by CHW staff corner metaphyseal lesions/corner fractures were not in fact representative of an injury or abuse of any kind because all "subsequent radiographs fail to show any fracture healing of the alleged injuries," thus undermining the original conclusion that P.B. had four fractures identified in various stages of healing. (R. 39:22). Dr. Sullivan opined that "there is no evidence of fracture healing at the proximal or distal ends of the tibia on either side. If these were fractures, there would be evidence of fracture healing on the repeat x-rays. Therefore, the 'corner metaphyseal lesions' are not fractures at all". (R. 39:22).

Dr. Sullivan agreed with the conclusions of Dr. Gootnick and Dr. Miller that the skeletal survey and x-rays revealed other signs associated with an unspecified metabolic bone disease in infancy and the weakening of the bones. (R. 39:23). He reported there were signs of "cupping of the anterior ribs" were seen in the x-rays taken while P.B. was at CHW, and cupping of the anterior ribs is indicative of rickets or other potential bone density issues. (R. 39:23). He also disagreed with the conclusions of Dr.

---

around May 2022.

Levas regarding the amount of force necessary to create the break to the tibia, and the conclusion that the break was "displaced." (R. 39:23).

Dr. Sullivan ultimately concluded in his report the following:

> a) P.B. "has a single tibial shaft fracture which is non-displaced, which means it looks like a crack in a China plate. This fracture was produced by the minimal amount of force necessary and no more, or else the fracture would have been displaced, which means the two sides of the fracture would have been apart from each other. There were no other injuries.
>
> b) Mr. Beine's explanation of hearing a pop when changing diapers is a very plausible explanation for this injury and is consistent with the fracture pattern.
>
> c) So P.B had one injury, explained by observed activities without any other head, neurologic or abdominal injury or fractures. The reported other fractures made it seem suspicious, but there are no other additional fractures to explain. The workup that was triggered by the "overcall" on the additional fractures was all entirely negative, including demonstrating that no other fractures existed.

(R. 39:23).

Like those of Dr. Miller and Dr. Gootnick, and the additional medical records of P.B., that report was turned over to the prosecution. (R. 39:28).

9. *The Beines Seek a Formal Opinion from a Geneticist & Speak with CHW Staff About Their May 2022 Conclusions*

*a. A September 28, 2022, Telephone Call with Dr. Kevin Boyd*

Following receipt of the May 2022 email from the prosecutor including demonstratives and new continued opinions from Dr. Petska and Dr. Boyd that the new medical reports, genetic test result, and medical opinions did not alter the conclusions of Dr. Petska and Dr. Boyd that the injuries were specific for child abuse and not a bone

disease, the Beines sought the opinion of a specialist with experience in rare mutations like that which was identified on P.B.'s blood results. (R. 39:26). They hired Dr. Susanna Sorrentino to review the matter. (R. 39:26). Due to the surprising continued support for the original medical diagnosis by Dr. Petska and Dr. Boyd despite all evidence to the contrary, counsel for the Beines contacted the CHW radiologists (Dr. Boyd and Dr. Plunk) on the matter to see if they would participate in a telephone call about their conclusions. (R. 39:29).

The telephonic interviews of the radiologist occurred on September 28, 2022. (R. 39:29). During the call with Dr. Boyd, he revealed that despite his assistance to the prosecution to "debunk" the conclusions of the medical experts hired by Mr. Beine which had been based upon a complete review of the medical history of P.B., while occurred around May 2022, he had never personally reviewed the follow-up radiology testing performed by Dr. Plunk on December 14, 2020, or Dr. Plunk's conclusions about the appearance of those abnormalities in his report, despite him having that information available in the medical record. (R. 39:29).

Upon learning about Dr. Plunk's findings from December 2020 (that two of the alleged fractures revealed no evidence of healing weeks later) during the call in September, 2022, Dr. Boyd agreed that it was possible that a genetic abnormality could be the cause of the unusual appearance of the ends of the leg bones and if it were true that the repeat scans did not show further healing (as he had never personally looked or reviewed the repeat scans even at the time of the September 2022 call), it was very unlikely those abnormalities were healing fractures as he had originally believed. (R.

39:30). He said that as he was not a geneticist and had not studied such potential mutations, he could not opine further on the issue. (R. 39:30).

During the September 2022 call, Dr. Boyd also confirmed that when he continued to assist the prosecution and helped Dr. Petska create a PowerPoint demonstrative to challenge the other medical doctors' determinations around May 2022, he had done this without having availed himself to the repeat scans taken as indicated and required as the standard for medical child abuse investigations. (R. 39:30). Dr. Boyd likewise agreed he had not reviewed any of the initial blood testing (and resulting abnormalities) from November 2020 and had never examined P.B. personally. (R. 39:30).

This September 2022 conversation was the first Mr. Beine and his counsel had learned that Dr. Boyd had been providing opinions without ever reviewing repeat scans, contrary to the standards set forth in the medical treatise guiding investigations, *Diagnostic Imaging of Child Abuse*, Third Edition, Edited by Dr. Paul K. Kleinman. (R. 39:29). This information also indicated that Dr. Petska, who had signed off on reports containing the information on the repeat scans in December 2020 and thus was aware of the new evidence regarding the alleged fractures, had enlisted Dr. Boyd's assistance in continuing to support the prosecution of Mr. Beine without informing Dr. Boyd that his initial conclusions were not supported by the repeat scans from December 2020. (R. 39:29).

*b. The Conclusions of Dr. Sorrentino & P.B.'s Final Diagnosis*

On December 6, 2022, Dr. Sorrentino, a physician at Medical Genetics of Nevada, gave her conclusions regarding the significance of P.B.'s genetic mutation and provided

the family with the proper medical diagnosis for the first time. (R. 39:26). This conclusion and diagnosis were based upon a review of P.B.'s medical history, Mrs. Beine's medical history, the medical reports from CHW, as well as other health and physical attributes of P.B. (R. 39:26). Dr. Sorrentino agreed that P.B. suffers from a genetic abnormality to the FN1 gene – specifically intronic, heterozygous variant, and diagnosed P.B. with Spondylometaphyseal Dysplasia, Corner Type, a spectrum disease that results in bone weakening, unexplained "corner fracture like lesions," and a variety of other symptoms that often resolve in childhood and do not persist as the child grows. (R. 39:26). That disease has a spectrum of traits and differs in severity for each sufferer. (R. 39:26). Expressions of this type of mutation were observed by Dr. Sorrentino throughout P.B.'s maternal familial side history. (R. 39:26). Based on all of the information reviewed, Dr. Sorrentino concluded that it is more likely than not that the injury to P.B.'s tibia and the identified irregularities were symptoms of that disorder, and not the result of abuse by Mr. Beine or anyone else. (R. 39:27).

This report and a summary of the conversation and new information learned during the September 2022 telephone call with Dr. Boyd was provided to the prosecution, and in response, the Milwaukee County District Attorney's Office offered a resolution that would ultimately result in complete dismissal of the charges. (R. 39:33).

B. The Filing of a Civil Case Against the Defendants

On March 20, 2025, the Beines filed a claim against the defendants in this case, alleging several claims, to include four civil rights violations pursuant to 42 U.S.C. § 1983 (denial of due process, denial of equal protection, failure to intervene, supervisory

liability), and five Wisconsin law-rooted tort claims (negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, tortious interference, and defamation). (R. 1).

The defendants, with CHW staff and the Medical College of Wisconsin ("MCW") represented separately, filed motions to dismiss the complaint pursuant to Rule 12(b)(6) on the grounds that the complaint failed to state a claim for which relief could be granted asserting several alleged grounds for dismissal. (R. 27, 28, 33, 34). Relevant to this appeal is both defendants' assertions that the statute of limitations had expired prior to the filing of the complaint in this matter and thus, the claim was time barred. (R. 28, 34).

MCW argued that the statute of limitations began to run on the dates of each individual defendant's involvement in the matter as this would be the day of injury (specifically in November and December 2020), and thus, the statute of limitations had passed ahead of the filing of the initial complaint. (R. 28:14). CHW took a different position, however, that the date of discovery of the injury was triggered by the CPS social worker's conclusion of the monitoring of the Beines. (R. 34:18). Regarding the conduct of Dr. Petska and Dr. Boyd after that date around May 2022, MCW argued that the allegations against CHW were conclusory and that any claims that would arise past January 2021 are specific only to Dr. Petska and Dr. Boyd and not CHW. (R. 34:19).

In response to the motions to dismiss, the Beines filed a timely Amended Complaint. (R. 39). The facts section of the Amended Complaint spanned 25 pages and discussed a detailed background of the initial conduct of the defendants in November

and December of 2020, as well as their continued assistance with the prosecution of Mr. Beine around May 2022, five expert medical opinions received throughout 2022 criticizing the conclusions of CHW staff as premature and counter to the evidence with P.B.'s final diagnosis received in December 2022, and the ultimate discovery of errors in the initial child abuse investigation by the Beines' counsel in the criminal matter on September 28, 2022.

Following receipt of the amended complaint, the defendants again renewed their motions to dismiss pursuant to Rule 12(b)(6), filing motions to dismiss and supportive briefs. (R. 43, 44, 45, 46). Defendant MCW asserted that the triggering event for the statute of limitations was the initial diagnosis of child abuse from November 2020 that ultimately led to Mr. Beine's arrest that same day. (R. 58:8-9).

The arguments of defendant CHW were near identical to its previously filed brief supporting dismissal, again asserting that there was no evidence of CHW employees or the facility's involvement in the matter after January 2021, and that if there were to be a claim that existed from the 2022 continued assistance of Dr. Petska or Dr. Boyd, CHW was not involved and thus, not responsible for it because those doctors were employed by MCW, the co-defendant entity. (R. 46:15-19).

The Beines filed a response to the motions to dismiss, and as it relates to the issue before this court, the determination of when the statute of limitations expired, asserted that the action was timely, had been sufficiently pled to survive a motion pursuant to Rule 12(b)(6), and also that application of the discovery rule effectively tolled the running of the statute of limitations. (R. 53:11-13).

On January 28, 2026, the district court issued a written decision dismissing both defendants' motion to dismiss the amended complaint. (R. 60). The district court asserted that any claim of injury by the Beines had been perfected sometime between the initial conduct of the defendants and the closure of the CPS investigation in January 2021. The court reasoned that the discovery rule did not extend the start of the statute of limitations calculus past this point because at the diagnosis by CHW staff and the defendants globally of child abuse "inflict a cognizable injury almost immediately." (R. 60:11). The decision continued that "while the information the Beines learned from medical experts in 2022 may have confirmed their belief as to the cause of P.B.'s injuries, that information did not unearth *a new injury to Mr. or Ms. Beine or a new wrongdoer*." (R. 60:12 (emphasis in original), citing *Claypool v. Levin*, 562 N.W.2d 584, 590 (Wis. 1997)).

Following receipt of the order granting dismissal of the amended complaint and associated judgment (R. 60, 61), the Beines filed a timely notice of appeal on February 4, 2026. (R. 62).

## STANDARD OF REVIEW

Appellate courts review *de novo* a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Thompson v. Cope*, 900 F.3d 414, 426 (7th Cir. 2018). Generally, for a complaint to survive a motion to dismiss filed pursuant to Rule 12(b)(6), a plaintiff need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief," sufficient to give the defendant "fair notice" of the claim and its basis. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007); *See also Milchtein v. Milwaukee County*, 42 F.4th

814, 821 (7th Cir. 2022). When considering whether to dismiss a complaint as insufficiently pled, the complaint is to be construed in the light most favorable to the plaintiff with all well-pleaded facts alleged to be accepted as true, and all reasonable inferences drawn in favor of the plaintiff. *Hernandez v. City of Goshen, Indiana*, 324 F.3d 535, 537 (7th Cir. 2003). Thus, this court must conduct an independent review of the complaint to determine the propriety of the dismissal and reverse the decision of the lower court if there is any reasonable view of the complaint upon which relief may be granted.

## SUMMARY OF ARGUMENT

The district court erred in dismissing the action, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that the case was commenced by the Beines following the expiration of the statute of limitations. The decision issued by the district court runs afoul to well-established law stating that the statute of limitations on a § 1983 claim begins to run the moment a defendant receives favorable outcome in the accompanying criminal matter. Here, the Beines' claims were perfected in mid-2022 when counsel for the Beines had a telephone conversation with Dr. Boyd regarding P.B.'s misdiagnosis. Based on extensive precedent from this Court and the Supreme Court of the United States, it would be at this point in time that the Beines became aware of the "cause" of the harm incurred. Therefore, the Beines' claims are well within the statute of limitations.

The district court's determination that the statute of limitations began to run at the time CPS closed its investigation is incorrect because it failed to apply the proper standard of review in the matter, and did not draw all reasonable inferences in the light most favorable to the Beines. Essentially, in reaching its determination, the district court reached outside of the record and speculated as to when the Beines became aware of the injuries they incurred. Thus, the district court did not engage in a proper evaluation of the 12(b)(6) motion.

Moreover, in endorsing a strict application of the discovery rule, the district court dismisses legitimate policy concerns that are at the heart of this matter—wrongful convictions based upon misconduct of government actors.

For these reasons, this Court should vacate the judgment dismissing this action and vacate the district court's order granting defendants' Rule 12(b)(6) motion to dismiss the amended complaint, ultimately remanding the matter for further proceedings in the district court consistent with this Court's order.

## ARGUMENT

### I. The District Court erred when granted it the defendants' Rule 12(b)(6) motion to dismiss the amended complaint on the grounds that the action was untimely and commenced after the statute of limitations had run.

#### A. The propriety of dismissal of a complaint pursuant to Rule 12(b)(6).

Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations. *Cancer Foundation, Inc. v. Cerberus Capital Management, LP,* 599 F.3d

671, 674 (7th Cir. 2009). Dismissal is only appropriate "when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness." *Id*. (quoting *Hollander v. Brown*, 457 F.3d 688, 691 n. 1 (7th Cir. 2006)).

This Court has cautioned that dismissal at the pleadings stage on statute of limitations grounds is an "irregular approach" appropriate "only where the allegations of the complaint itself set forth *everything* necessary to satisfy the affirmative defense" while construing all reasonable inferences from the complaint in favor of the non-moving party. *Sidney Hillman Health Center of Rochester v. Abbott Laboratories, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (quoting *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610-613-14 (7th Cir. 2014)). Granting a motion to dismiss on the statute of limitations would be a "departure from orthodoxy" and should only be the outcome in clear cut cases where the statute of limitations has unquestionably passed. *Sidney Hillman*, 782 F.3d at 928.

This Court has held that at the motion to dismiss stage, "the question is only whether there is *any* set of facts that if proven would establish a defense to the statute of limitations." *Clark v. City of Braidwood*, 318 F.3d 764, 767 (7th Cir. 2003). "When a complaint is dismissed at the pleadings stage the question is not what are the facts, but is there a set of facts that if proved would show that the case had merit?" *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 80 (7th Cir. 1992).

"A cause of action accrues 'when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief.'" *Cielak v. Nicolet Union High School District*, 112 F.4th 472, 477 (7th Cir. 2024). Accrual "occurs when a

plaintiff knows the fact and the cause of an injury." *O'Gorman v. City of Chicago*, 777 F.3d 885, 889 (7th Cir. 2015). Only at that point can a plaintiff file suit against the individual defendants for their wrongful acts and omissions.

This court must review *de novo* the decision of the district court to dismiss the amended complaint pursuant to Rule 12(b)(6) on the grounds that the Beines claim was untimely, and thus, did not state a meritorious claim upon which relief can be granted. *See Thompson v. Cope*, 900 F.3d 414, 426 (7th Cir. 2018).

**B. The Beines' claims were properly pled in the amended complaint and dismissal pursuant to a Rule 12(b)(6) motion on statute of limitations runs afoul of well-established law and was unsupported by the amended complaint.**

A plain review of the Beines' amended complaint demonstrates that there were no grounds for the court to dismiss the complaint on statute of limitations grounds pursuant to a Rule 12(b)(6) motion to dismiss. Here, as detailed in 25-pages of factual allegations, the amended complaint plainly sets forth facially-meritorious claims against both individuals and entities with allegations that defendants operated under the color of law. The district court erred in arbitrarily choosing the date of the closure of the parallel CPS investigation, which occurred in January 2021, as the time in which the statute of limitations began to run, as at that time, none of the Beines claims were perfected and they did not learn of the information necessary to pursue such claims until mid to late 2022, which means the complaint was timely filed.

**1. Dismissal pursuant to Rule 12(b)(6) was improper as the amended complaint sets forth sufficient facts and allegations that demonstrate the Beines' claims were not perfected until mid-2022 at the earliest, as they were unaware of the "cause" of the harm incurred until that time.**

In support of the Beines' position on appeal, they first offer the appropriate standards for claims against entities. All parties agreed in their briefing in the district court that the claims against the entity defendants are subject to the *Monell* standard for municipal entities for the purpose of the §1983 claims. *See Monell v. Department of Social Services*, 436 U.S. 658 (1978). To raise a meritorious *Monell* claim, a plaintiff must show municipal action and that the action was the cause of the constitutional violation. *Id.* "The constitutional violation is the 'fact' of the injury, the municipal action is the 'cause' and the plaintiff must know (or have reason to know) of both for his claim to accrue." *Cielak v. Nicolet Union High School District*, 112 F.4th 472, 477 (7th Cir. 2024).

Simply put, in a claim filed pursuant to *Monell*, the statute of limitations does not begin to run until plaintiffs know or have reason to know (1) that they were harmed by the defendant, **and** (2) that the defendants caused their harm due to their policies, procedures or practices of the entity. The only information related to a potential date of discovery related to failure to adhere to guidelines or standards of medical practice came detailed in the amended complaint is the allegation that legal counsel for the Beines learned for the first time on September 28, 2022, during a call with Dr. Boyd that he failed to follow the principles and policies guiding the child advocacy practice, as he admitted on that date that he had never reviewed the subsequent x-rays of P.B. showing

his initial conclusions and diagnoses were incorrect before continuing to assist the prosecution around May 2022. (R. 39:29-30). The amended complaint reads:

> 193. During the investigation into the criminal case, the defense conducted telephonic interviews with Dr. Boyd and Dr. Plunk, on September 28, 2022.
>
> 194. During this telephone call, Dr. Boyd revealed that despite his assistance to the prosecution to "debunk" the conclusions of the several consulting experts, he had never personally reviewed the follow up radiology testing CHW performed in December 2020 to determine if there was evidence of healing injuries.
>
> 195. Dr. Boyd agreed that it was possible that a genetic abnormality could be related to the appearance of bone fractures, but that this was generally outside of his expertise.
>
> 196. Dr. Boyd confirmed that he had not been aware of the findings from the repeat scans while he continued to draw his own conclusions and support Mr. Beine's prosecution [around May 2022].

(R. 39:29-30).

Thus, looking to the allegations set forth in the amended complaint for the "cause" of the harm by the entities, that cause was not learned by the Beines until September 2022 at the earliest, putting the date of commencement of action well-within the statute of limitations. Alternatively, if looking at the dates of receipt of the expert reports detailing what had been ignored by CHW staff, the first expert medical report calling into question the original diagnosis detailed in the amended complaint was received in April 2022, and that the final report diagnosing P.B. with a genetic disorder was made in December 2022.

Moreover, the decision of the district court completely ignores the fact that there was just a singular grouping of injuries rooted in the performance of the medical care in

November and December 2020. As pled in detail throughout the amended complaint, both Dr. Boyd and Dr. Petska continued to assist the prosecution with their pursuit of a conviction of Mr. Beine around May 2022, well-within the three years preceding the filing of this action. This conduct, combined with the initial conduct, is a singular cause of action and the statute of limitations begins to accrue at the time of the final act of negligence that was a part of the continuum of malpractice.

This rule is detailed in *Tamminen v. Aetna Casualty & Surety Co.*, where Tammien sought review of a "submission of controversy" based on claims that her treating doctor and the Gundersen Clinic of La Crosse were guilty of malpractice, due to negligent surgical, medical, and hospital care services in connection with gastric bypass surgery performed on November 4, 1975. 109 Wis.2d 536, 539, 327 N.W.2d 55, 56 (1982). However, Tammien remained in a course of treatment up to and until she was discharged on March 30, 1976. *Id.* at 553-554.

The court determined that this cause of action demonstrated a single pled unit of treatment, with both surgical and remedial care, and period of negligent treatment running from November 3, 1975, to March 30, 1976. *Id.* at 557-558, 560. When determining when the clock for the statute of limitations began, the court determined that "[a] cause of action accrues only when the cause of action is complete" and framed the analysis that where "the negligent acts of malpractice were continuous, the cause of action is not complete until the last date on which the malpractice occurred." *Id.* at 559. In doing so, the court held and defined that "statute of limitations for a course of negligent medical treatment accrues at the time of the last act of negligence that was a

part of a continuum of malpractice" and that such creates a single cause of action that encompasses the entire course of malpractice. *Id.* at 562-563 (emphasis added). *See also Frechette v. Ravn*, 145 Wis. 589, 590, 130 N.W. 453 (1911).

For all of the reasons detailed above, this action did not begin to accrue until, at the earliest, the date of the final negligent act, which the amended complaint details occurred around May 2022. As a result, dismissal of the action pursuant to Rule 12(b)(6) on statute of limitations grounds was improper because the amended complaint sufficiently establishes a cause of action that was filed before the expiration of the statute of limitations.

**2. The determination that the statute of limitations began to run at the time child protective services closed its investigation was arbitrary and unsupported by the allegations set forth in the amended complaint.**

Dismissal pursuant to Rule 12(b)(6) is improper when the complaint alleges facts that show the claim raised is "plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). (emphasis added) *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020). The Beines agree that "[w]hen considering the viability of a claim in the face of a Rule 12(b)(6) challenge, [the court] may reject sheer speculation, bald assertions, and unsupported conclusory statements," but the amended complaint in question contained no such unsupported allegations. *See Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013); *Iqbal*, 556 U.S. at 678, 681, 129

S.Ct. 1937; *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Instead, it was the district court's decision granting dismissal of the amended complaint and conclusion that the statute of limitations began to run when CPS closed its parallel, non-criminal investigation was improper and arbitrary. That decision was based upon speculation and unsupported conclusions, some of which were completely outside the record, all of which were adverse to the Beines and contrary to the allegations set forth in the amended complaint. Therefore, the dismissal was contrary to well established law and must be reversed.

The district court erred when it did not draw all reasonable inferences and conclusions in favor of the Beines, and instead reached outside of the record and speculated as to when the couple knew of the cause of their injury. The court, even though the amended complaint specifically detailed how and when the Beines learned of the cause of injury, identified a different date and point of discovery at the point CPS closed its case.

The amended complaint stated that the defendants did not properly follow the standards of a child abuse medical evaluation and that the Beines received four separate expert opinions detailing, not just a difference of medical opinion, but errors in the medical evaluation in 2022, along with learning that Dr. Boyd did not review the additional scans ahead of assisting the prosecution in May of 2022.

However, the court opined that the "the Beines knew or should have known the fact and the cause of their injuries no later than January 2021, when CPS finished its investigation and determined that no child abuse had occurred". (R. 60:10). This

conclusion was arbitrary and unsupported by the amended complaint and record before the court at the time.

Specifically, the order granting dismissal misinterprets and makes unsupported assumptions about the relevance and impact of the CPS conclusion in terms of what the Beines knew and when they knew that information. The amended complaint details how CPS opened a child protective service investigation upon a call from CHW staff, the protection plan put in place by CPS, and how and when that department's monitoring terminated. Related to the district court's dismissal are the following paragraphs from the amended complaint:

> 119. After several weeks of monitoring, CPS concluded that the allegations of physical abuse by Mr. Beine were *unsubstantiated*.
>
> 120. CPS concluded that "there were no safety concerns; No *new* present danger or impending danger threats were identified, so there was no reason to keep the case open, or refer the family for other services.
>
> 121. Specifically, CPS concluded that they were only "able to confirm Mr. Beine caused one break," and that even that injury to the long bone "was not caused intentionally or seemingly even recklessly."
>
> 122. CPS's conclusion was reached in January 2021, after monitoring the Beines and after its review of the follow-up testing by CHW, which indisputably *could not confirm* that the other observed abnormalities were in fact fractures or caused by any person, let alone Mr. Beine.
>
> 123. CPS's investigation revealed nothing to support a finding that the Beines were impatient, not aligned with the child, had any impulse control issues, or any ill intent towards P.B.

R. 39 at ¶¶ 119-123 (emphasis added).

Contrary to the district court's interpretation of the allegations set forth in the amended complaint, the CPS investigation did not conclude that abuse did not occur or that the child abuse diagnosis and evaluation conducted by CHW staff was medically unsupported or flawed. Instead, the amended complaint alleges that CPS concluded that the allegations were "unsubstantiated" as part of the protective services matter – a term of art in CPS investigations. It is also important to note that the CPS conclusion appears to have had no impact on the defendants' continued cooperation in the prosecution of the Beines.

Moreover, while the amended complaint states that "CPS" did not believe that Mr. Beine had intentionally or recklessly harmed his son, there is nothing in the complaint that would lead the factfinder to conclude this is a lay opinion of an observer would trigger the discovery rule for the Wisconsin law-rooted claims, nor should it be construed as doing so for the §1983 counts. *See Claypool v. Levin*, 209 Wis. 2d 284 (1997), citing *Clark v. Erdmann*, 161 Wis. 2d 428, 448, 468 N.W.2d 19 (1991)(…"[A]n unsubstantiated lay belief is not sufficient for discovery to occur, [but rather what is required is] the existence of a reasonable likelihood for an objective belief as to an injury *and its cause*…"(emphasis added)).

The fact that CPS closed its investigation into the protective services matter because they determined there were no safety concerns or new danger or threats to P.B. did not inform the Beines as to how the misdiagnosis of "child abuse" occurred or even

if there had been a “misdiagnosis” at all. To draw such a conclusion required the district court to draw its own conclusions, outside the four corners of the complaint, about the individual who made the conclusion and the legal and medical relevance of that opinion. These inferences are not supported by the amended complaint and most certainly were not drawn in favor of the non-moving party.

Thus, the district court erred when it used the lay opinion of a CPS worker to start the clock on the Beines’ claims. Nothing in that investigation’s findings would notify the Beines that they were injured by hospital staff or the cause of that injury. It merely supported what the Beines already knew, which was that Mr. Beine was innocent. Furthermore, if the CPS investigation were dispositive on the matter, the criminal proceedings would likewise have concluded with dismissal at that time, but it did not. Despite the CPS conclusion, the prosecution and defendants moved full steam ahead in its prosecution of Mr. Beine. The amended complaint highlights that very fact when it alleges that in May 2022, Dr. Petska and Dr. Boyd continued to assist in the criminal prosecution of Mr. Beine, more than fifteen months after the CPS investigation was closed.

More importantly, the amended complaint provides no information on whether the CPS investigation provided the Beines with any additional information on the acts and omissions of each of the defendants that amounted to nine constitutional and common law violations the pleading detailed. There is no evidence in the record that the CPS investigation conclusion provided the Beines with any information related to

claims brought in this suit that was not already known on November 21, 2020, when Mr. Beine was arrested.

The Beines did not learn of the acts and omissions of the Defendants until receiving the reports from (1) Dr. Gootnick on April 18, 2022, Dr. Sullivan on June 8, 2022, and (3) Dr. Sorrentino on December 6, 2022, and the specific acts and omissions of Dr. Boyd and Dr. Petska learned on September 28, 2022. In fact, the amended complaint does not even indicate when or how the Beines learned of the conclusions of CPS and whether at the time of the conclusion of the monitoring, they were informed that CPS did not believe Mr. Beine had harmed P.B. intentionally or recklessly. Any assumption or speculation that this was communicated in January 2021 to the Beines requires a conclusion be drawn in favor of the *moving* party, when the law requires the very opposite, that all reasonable inferences by drawn in favor of the *non-moving* party.

Moreover, the district court seemingly concluded that simply by possessing their son's medical records, they were able to discover the "cause" of their injuries by the defendants. In asserting the expert reports carried no relevance to the discovery of their cause of action, the court wrote:

> [I]t's inconceivable that the Beines wouldn't have had access to the medical records showing who was responsible for their injuries; in fact, it appears the Beines provided those records to others when search for a second opinion. In other words, while the information the Beines learned from medical experts in 2022 may have confirmed their belief as to the cause of P.B.'s injuries, that information did not unearth *a new injury to Mr. or Ms. Beine or a new wrongdoer.*

(R. 60:12 (internal record citations omitted; emphasis in original)).

These conclusions assume that the medical records informed the Beines, untrained, lay readers without medical degrees, that the medical treatment and diagnosis of P.B. was flawed and the process followed by the defendants was contrary to the standards of the child advocacy medical practice. They had no such information and the amended complaint makes no allegation that they did have that information about the cause of action until receiving the alternative second-expert medical opinions, in combination with the information learned from Dr. Boyd in September 2022.

Knowledge of the "cause" of injury is paramount in this court's analysis of claim accrual. *See O'Gorman*, 777 F.3d at 889. The cause of action here is not that Beines simply disagreed with the reasonable medical opinion arrived at by the defendants. Such a disagreement is, in fact, no cause of action at all. The cause of action is based on the fact that the defendants failed to follow the appropriate medical standards guiding their profession, failed to explore any alternative hypothesis, provided P.B. substantially lacking medical treatment, and when it became apparent that other medical practitioners disagreed with their conclusions and challenged the procedures they utilized, the defendants doubled-down on their negligent care and continued to assist in the pursuit of a criminal conviction of Mr. Beine nearly a year and a half after the care of P.B. by the defendants had ceased.

The Beines did not learn that the conduct of the defendants was negligent and problematic from a professional medical standpoint until they received this information from the additional experts in concert with the conduct described by Dr. Boyd in the September 2022. That was when the Beines discovered that they had a ripe claim and

cause of action against the defendants. To conclude otherwise is unsupported by the record and the amended complaint in this case.

**3. The public policy concerns of the district court are unfounded and contrary to this Court's holding in other cases.**

The district court's conclusion that the Beines' "broad reading of the discovery rule would place almost unlimited control of the accrual of injury claims in the hands of plaintiffs, extending the life of such claims essentially indefinitely while plaintiffs seek out supportive expert opinions" highlights a concern that is unsupported by both the record and timeline surrounding the events in this case. (R. 60:13). The Beines were diligent in their pursuit for answers as to how and why P.B. was injured, as was necessary to fight against the criminal case. That the defendants the Milwaukee District Attorney's Office in its pursuit of a criminal conviction against Mr. Beine.

The couple took P.B. to another hospital group, and sought the expert opinions of doctors from other specialty groups to determine what was wrong with their son and to determine why the defendants reached the unsupported conclusions and medical diagnosis of "child abuse." Thus, application of the discovery rule in this case and the setting of the accrual date to the time the Beines diligently learned of the improper and negligent medical care received by their son, the continued assistance of the defendants to the prosecution to pursue Mr. Beine's conviction, and the specific errors of the defendants in September 2022, creates no new rule or expansion of the discovery rule already applied in this circuit.

Furthermore, this case is not simply one involving a medical misdiagnosis but the role of the defendants in their work with state actors in pursuing a criminal prosecution against Mr. Beine. It is unique in that regard from other claims involving negligent medical care and is analogous to those § 1983 actions stemming from unlawful, unconstitutional conduct of other state actors, such as law enforcement or prosecutors, to secure unjust criminal convictions. From a public policy perspective, to conclude that the cause of action in cases such as this where charges against a once-criminal defendant are dismissed following the discovery of improper conduct by actors operating under the color of the law accrue beginning at the time of the initial unjust arrest, would essentially bar nearly all claims such as this due to the limits on §1983 actions for those with co-occurring criminal litigation.

This is because, in cases involving wrongful convictions based upon misconduct of government actors, the U.S. Supreme Court has determined that accrual of civil rights violations does not begin at the time of the arrest or charging of the individual, but rather at the time the case is successfully overturned or resolved in some fashion in favor of the defendant, and actions may not be filed until the criminal case resolves successfully.

For example, in *McDonough v. Smith*, 588 U.S. 109, 117-18, 139 S. Ct. 2149, 204 L. Ed. 2d 506 (2019), citing *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994), the U.S. Supreme Court held that a defendant "could not bring his fabricated-evidence claim under §1983 prior to favorable termination of his prosecution[,]" and that such a rule is "rooted in pragmatic concerns with avoiding parallel criminal and

civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." The same pragmatic concerns apply in cases like this when private actors who engage in unlawful conduct subject to §1983 actions under the color of law is involved and those actions are discovered prior to conviction and dismissal of criminal charges results following that discovery. Thus, the Beines ask this court to look to these analogous matters for guidance when determining at what point the cause of action was perfected.

## CONCLUSION

For the foregoing reasons, plaintiffs-appellants Evan and Michelle Beine respectfully move this Court to vacate the judgment dismissing this action and vacate the district court's order granting defendants' Rule 12(b)(6) motion to dismiss the amended complaint, remanding the matter for further proceedings in the district court consistent with this Court's order.

Dated this 26th day of March, 2026.

GIMBEL, REILLY, GUERIN & BROWN LLP

By:

/s/Nicole M. Masnica
NICOLE M. MASNICA
State Bar No. 1079819
nmasnica@grgblaw.com
Attorneys for Plaintiffs-Appellants
Evan & Michelle Beine

POST OFFICE ADDRESS:
Two Plaza East, Suite 1170
330 East Kilbourn Avenue
Milwaukee, Wisconsin 53202
Telephone:  414/271-1440
Facsimile:  414/271-7680

**CERTIFICATIONS REGARDING LENGTH AND DIGITAL MEDIA**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Seventh Circuit Rule 31(e), I certify that this brief conforms to the rules for a Brief and Appendix produced with a proportional serif font and has a length of 11,250 words. I further certify that this brief, cover to conclusion, was prepared in Microsoft Word and is being uploaded to the Seventh Circuit website.

Dated this 26th day of March, 2026.

/s/Nicole M. Masnica
NICOLE M. MASNICA

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

No. 26-1233

---

EVAN BEINE and MICHELLE BEINE,

Plaintiffs-Appellants,

v.

CHILDREN'S HOSPITAL AND HEALTH SYSTEM, INC.,
CHILDREN'S HOSPITAL OF WISCONSIN, INC.,
THE MEDICAL COLLEGE OF WISCONSIN, INC.,
HILLARY W. PETSKA, M.D., MICHAEL N. LEVAS, M.D.,
KEVIN P. BOYD, D.O., MATTHEW R. PLUNK, M.D.,
HEATHER L. MARSCHALL, N.P., AND
DEBORAH A. BRETL, N.P.,

Defendants-Appellees.

---

APPEAL FROM THE JUDGMENT AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' AMENDED COMPLAINT ON JANUARY 8, 2026, IN THE EASTERN DISTRICT OF WISCONSIN, THE HONORABLE STEPHEN C. DRIES, UNITED STATES MAGISTRATE JUDGE, PRESIDING

---

# APPENDIX TO PLAINTIFFS-APPELLANTS' INITIAL BRIEF

---

NICOLE M. MASNICA
Wisconsin State Bar No. 1079819

ZACHARY T. WROBLEWSKI
Wisconsin State Bar No. 1119194

Gimbel Reilly Guerin & Brown LLP
330 E. Kilbourn Ave., Suite 1170
Milwaukee, WI 53202
Tel: 414-271-1440
Attorneys for the Plaintiffs-Appellants

## APPENDIX

Eastern District Judgment, January 8, 2026 .......... 102

Decision and Order Granting Defendants' Motions to Dismiss, January 8, 2026 .......... 103

Certification as to Appendix .......... 117

# United States District Court
## Eastern District of Wisconsin

**EVAN BEINE and**
**MICHELLE BEINE,**

Plaintiff(s),

**JUDGMENT IN A CIVIL CASE**

v.

Case No. 25-CV-432-SCD

**CHILDREN'S HOSPITAL AND HEALTH SYSTEM, INC.,**
**CHILDREN'S HOSPITAL OF WISCONSIN, INC.,**
**THE MEDICAL COLLEGE OF WISCONSIN, INC.,**
**HILLARY W. PETSKA,**
**MICHAEL N. LEVAS,**
**KEVIN P. BOYD,**
**MATTHEW R. PLUNK,**
**HEATHER L. LISKO, and**
**DEBORAH A. BRETL,**

Defendant(s).

☐ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried, and the jury has rendered its verdict.

☒ **Decision by Court.** This action came before the Court for consideration.

**IT IS HEREBY ORDERED AND ADJUDGED** that this entire action is dismissed with prejudice and that the Beine's shall take nothing from any of the defendants by their amended complaint.

Approved: Stephen C. Dries
STEPHEN C. DRIES
United States Magistrate Judge

Dated: January 8, 2026

LINDA M. KLEMM
Clerk of Court

*s/ K. Hubacz*
(By) Deputy Clerk

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**EVAN BEINE** and
**MICHELLE BEINE,**

**Plaintiffs,**

**v.** **Case No. 25-CV-432-SCD**

**CHILDREN'S HOSPITAL AND HEALTH SYSTEM, INC.,**
**CHILDREN'S HOSPITAL OF WISCONSIN, INC.,**
**THE MEDICAL COLLEGE OF WISCONSIN, INC.,**
**HILLARY W. PETSKA,**
**MICHAEL N. LEVAS,**
**KEVIN P. BOYD,**
**MATTHEW R. PLUNK,**
**HEATHER L. LISKO,** and
**DEBORAH A. BRETL,**

**Defendants.**

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT

---

In this lawsuit, Evan and Michelle Beine generally assert that various medical professionals rushed to judgment when they accused Evan of physically abusing P.B., the couple's five-week-old baby. The incident began on November 21, 2020, when Mr. Beine heard a "popping sound" while changing P.B.'s diaper. Later that morning, the Beines brought P.B. to the emergency room at Children's Wisconsin, where x-rays revealed a recent fracture to P.B.'s left leg and apparent evidence of healing fractures in both legs.

Believing that the fractures had been caused by more force than what would typically be used during a diaper change, hospital staff referred the matter to its child advocacy team as an incident of potential child abuse. The child advocacy team determined, based solely on

its review of the imaging results, that P.B.'s injuries were consistent with physical abuse. A member of the team contacted police, who responded to the hospital and, after talking to hospital staff, arrested Mr. Beine. A few weeks later, on December 15, 2020, Mr. Beine was charged in state court with felony child abuse.

Hospital staff also referred the matter to child protective services. While the CPS investigation was ongoing, the Beines were prohibited from having certain contact with their infant son. CPS closed its investigation in January 2021, finding the allegations of physical abuse unsubstantiated. Around that same time, the Beines began seeking second opinions about the causes of P.B.'s injuries. Although several medical professionals posited throughout 2022 that P.B.'s injuries could have been caused by an underlying bone disease, it wasn't until December 2022 that the Beines received an official diagnosis confirming a genetic bone disorder. Despite this new evidence, the criminal prosecution continued, allegedly with the help of several members of the hospital's child advocacy team. The charge was eventually dismissed after Mr. Beine completed a deferred prosecution agreement.

In March 2025, the Beines sued the medical professionals involved in the child abuse allegations, as well as their employers and the hospital itself, asserting various claims under both federal and state law. The Beines later filed an amended complaint that asserts nine counts against nine defendants. The defendants have moved to dismiss the amended complaint, arguing that all nine counts are time-barred under the applicable statute of limitations. The defendants further contend that the amended complaint fails to state plausible claims for relief under either federal or state law.

Because the allegations in the amended complaint clearly establish that the Beines' claims are untimely, I will grant the defendants' motions to dismiss.

## BACKGROUND

At around 11:30 a.m. on November 21, 2020, Evan and Michelle Beine brought their five-week-old baby, P.B., to the emergency room at the Milwaukee campus of Children's Wisconsin after Mr. Beine heard a "popping sound" while changing P.B.'s diaper at home. Am. Compl. ¶¶ 36–42, ECF No. 39. Michael Levas, a pediatric emergency medicine physician assigned to P.B.'s care, ordered and administered x-rays and took blood work. *Id.* ¶¶ 12, 44–45. Kevin Boyd (a radiologist) reviewed the x-rays and noted the following findings: acute, oblique minimally displaced fracture of the mid left tibial diaphysis; subacute appearing, healing metaphyseal corner fracture of the proximal right tibial metaphysis; and additional metaphyseal fractures suggested of the medial distal right and left tibial metaphysis. *Id.* ¶¶ 13, 54–55.

The child advocacy team at the hospital immediately investigated the matter as a potential incident of child abuse. *See* Am. Compl. ¶¶ 8–10, 45, 60. The team was led by Heather Lisko and Deborah Bretl, nurse practitioners who specialize in child advocacy, protection services, and child physical abuse. *Id.* ¶¶ 15–16, 46, 62. "Under Dr. Levas's supervision, Dr. Kenzie contacted Bretl and the Child Advocacy Center at or around 1:23 p.m. to report concerns of potential child abuse." *Id.* ¶ 46. The child advocacy team did not examine P.B. or obtain a complete or accurate medical history. *Id.* ¶¶ 61, 65. Instead, based solely on her review of the available medical records, Lisko concluded that P.B.'s injuries were "highly concerning for child physical abuse." *See id.* ¶¶ 60–76. According to Lisko, "unexplained" bruising on P.B.'s left leg also supported her conclusion that P.B. had been physically abused. *See id.* ¶¶ 77–82. However, providers at P.B.'s recent wellness visits—including one the day prior—did not note any bruising. *See id.* ¶ 83. Lisko's supervising

physician, Hillary Petska, signed off on her report without examining P.B. or meeting with the Beines. *Id.* ¶¶ 11, 18–19, 62, 93–95.

Later that afternoon, hospital staff contacted the police. *See* Am. Compl. ¶¶ 47–49. By that time, Dr. Levas (who is not a radiologist) had reviewed Dr. Boyd's findings and interpretation. *See id.* ¶¶ 53–54. Dr. Levas told the police that P.B. had a long bone "spiral" fracture in his left leg and three other fractures in his legs that had healed. *Id.* ¶¶ 50–52. Dr. Levas also told the police that P.B.'s injuries were not consistent with Mr. Beine's story and that a large amount of force was necessary to create the four fractures allegedly observed on the x-rays. Based on Dr. Levas's statements, Mr. Beine was arrested and taken into police custody. *Id.* ¶¶ 56, 97. On December 15, 2020, Mr. Beine was charged in Milwaukee County Circuit Court with felony child abuse. *Id.* ¶ 98.

Hospital staff also contacted child protective services, which opened its own investigation. *See* Am. Compl. ¶¶ 20–23, 113. CPS staff examined P.B. late in the afternoon on November 21, 2020, and noted that he appeared clean, well-nourished, and not in any pain. *Id.* ¶¶ 114–16. While the CPS investigation was ongoing, Ms. Beine was not allowed to see P.B. unsupervised, and Mr. Beine was prohibited from having unsupervised physical contact with P.B or engaging in P.B.'s care in any capacity. *Id.* ¶¶ 117, 211. To accommodate those restrictions, the family moved in with Ms. Beine's parents and had to pay rent on top of their mortgage. *Id.* ¶¶ 118, 212–13. After several weeks of monitoring—and considering follow-up testing (discussed below)—CPS closed its investigation in January 2021, finding that no physical abuse had occurred. *See id.* ¶¶ 119–24.

Meanwhile, the blood work results came in. *See* Am. Compl. ¶ 125. Testing revealed an elevated parathyroid hormone level and lower than normal levels of Factor IX, a protease

that impacts the body's ability to clot blood. *Id.* ¶¶ 125–26. Testing also revealed that P.B. had a vitamin D deficiency. *Id.* ¶ 127.

P.B. had two follow-up appointments at Children's, on November 30, 2020, and December 14, 2020, respectively. *See* Am. Compl. ¶ 130. X-rays from those appointments revealed further healing of the right leg fracture, which was suggestive of a subacute injury. *Id.* ¶¶ 131–32. However, the reviewing radiologists were less certain about whether the other metaphyseal fractures had been caused by a subacute injury. Matthew Plunk, the doctor who performed the skeletal survey at the December 14 appointment, nevertheless concluded that the images remained concerning for suspected child physical abuse. *Id.* ¶¶ 14, 99–101. The next day, APNP Lisko drafted a child advocacy follow-up report based on her review of Dr. Plunk's skeletal survey. *Id.* ¶¶ 102–04. Lisko concluded that the follow-up diagnostics did not impact the level of suspicion of abuse, and she stood by her initial assessment that P.B. had been physically abused. Dr. Petska again signed off on Lisko's report without treating P.B., talking to the Beines, or considering alternative hypotheses. *Id.* ¶ 105.

Thereafter, the Beines sought second opinions about P.B.'s injuries from UW Health System. *See* Am. Compl. ¶¶ 133–35. Based on their review of P.B.'s medical records, UW Health physicians noted "possible metaphyseal fractures bilaterally," but, in their view, that finding was "less clear." *Id.* ¶¶ 136–37. The physicians further noted that the distal metaphysis in P.B.'s legs was of "unclear etiology and could be normal variants." *Id.* ¶¶ 138–39. One UW Health physician explained that there were two possible causes of P.B.'s injuries: (1) more force used than what would typically be done in a diaper change, or (2) an underlying bone issue. *Id.* ¶ 140. Genetic testing subsequently revealed a variant associated with bone weakness and unexplained fractures. *Id.* ¶ 142.

The Beines continued to seek additional opinions throughout 2022. In April, Susan Gootnick (a radiologist) concluded that P.B.'s injuries were evidence of metabolic bone disease or rickets, not child abuse. *See* Am. Compl. ¶¶ 163–68. Similarly, in June, Chrisopher Sullivan (a pediatric orthopedic surgeon) reported that the metaphyseal lesions seen on previous x-rays were not fractures at all, but rather were signs of metabolic bone disease and weakening bones. *See id.* ¶¶ 145–51. Thus, according to Dr. Sullivan, P.B. had sustained only one injury—a left leg fracture that was produced by a minimal amount of force and, therefore, consistent with Mr. Beine's diaper-change story. Marvin Miller (a pediatric geneticist) also noted characteristics of metabolic bone disease. *See id.* ¶¶ 152–61. Ultimately, on December 6, Susanna Sorrentino (a medical geneticist) diagnosed spondylometaphyseal dysplasia, corner type—a disorder that results in bone weakening, unexplained corner fracture like lesions, and a variety of other symptoms that often resolve in childhood. *See id.* ¶¶ 170–77. Based on the information she reviewed, Dr. Sorrentino concluded that it was more likely than not that P.B.'s injuries were symptoms of that disorder and not the result of abuse.

The Beines shared these findings with prosecutors and members of the hospital's child advocacy team, but they refused to move off their positions, and Dr. Petska and Dr. Boyd continued to assist the prosecution. *See* Am. Compl. ¶¶ 184–99. Specifically, Dr. Petska and Dr. Boyd met with the charging prosecutor, reiterated their child abuse findings, helped prepare demonstrative exhibits for use at trial, reviewed some expert findings, and prepared rebuttals to other physicians. Dr. Boyd later admitted, however, that he never personally reviewed the follow-up radiology testing performed in December 2020. In July 2023, Mr. Beine pleaded no contest to felony child neglect and entered into a deferred prosecution

agreement. *See State v. Beine*, Milwaukee County Case Number 2020CF4472, *available at* https://wcca.wicourts.gov/case.html (last accessed Dec. 15, 2025).[1]

In March 2025, the Beines filed suit in federal court, asserting various federal and state-law claims against nine defendants. *See* Compl., ECF No. 1. The matter was randomly assigned to me, and all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3, 14 & 16. After the defendants moved to dismiss the original complaint, *see* ECF Nos. 27 & 33, the Beines filed an amended complaint in August 2025 that contains additional factual allegations, *see* ECF No. 39. On September 12, 2025, the defendants moved to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* MCW Defs.' Mot. Dismiss, ECF No. 43; Children's Defs.' Mot. Dismiss, ECF No. 45.

## MOTION TO DISMISS STANDARD

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "To survive a motion to dismiss for failure to state a claim, the . . . complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Milchtein v. Milwaukee County*, 42 F.4th 814, 821 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

[1] A court may take judicial notice of public records available on government websites. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Bova v. U.S. Bank, N.A.*, 446 F. Supp. 2d 926, 930 n.2 (S.D. Ill. 2006) (collecting cases where courts took judicial notice of public records and government documents).

(2009)). In reviewing a Rule 12(b)(6) motion, courts must "accept the well-pleaded facts in the complaint as true and draw reasonable inferences in the plaintiff's favor." *Bronson v. Ann & Robert H. Lurie Child.'s Hosp. of Chi.*, 69 F.4th 437, 448 (7th Cir. 2023) (citing *KAP Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 523 (7th Cir. 2022)). "[B]ut legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *Id.* (quoting *KAP Holdings*, 55 F.4th at 523).

**DISCUSSION**

The amended complaint asserts nine counts against nine defendants. *See* Am. Compl. ¶¶ 223–72. Four of the nine counts arise under federal law, specifically 42 U.S.C. § 1983: (I) violation of due process; (II) violation of equal protection; (III) failure to intervene; and (IV) supervisory liability. The other five counts arise under state law: (V) negligence; (VI) negligent infliction of emotional distress; (VII) intentional infliction of emotional distress; (VIII) tortious interference; and (IX) defamation. The Beines bring these counts against three entities and six individuals, which can be grouped into two categories: those affiliated with The Medical College of Wisconsin, Inc. (Dr. Petska, Dr. Levas, Dr. Boyd, and Dr. Plunk), and those affiliated with Children's Hospital and Health System, Inc., and Children's Hospital of Wisconsin, Inc. (APNP Lisko and APNP Bretl). The Beines assert each count against all nine defendants except for Count IV, which they assert against only Dr. Petska and Dr. Levas.

The defendants have moved to dismiss all nine counts asserted in the amended complaint. They first argue that the Beines' claims are barred by the statute of limitations. "A limitations defense is not often resolved on a Rule 12(b)(6) motion because 'a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations.'" *Amin*

*Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 492 (7th Cir. 2017) (quoting *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009)). However, dismissal at this early stage is appropriate "when a plaintiff's allegations clearly establish that the claims are untimely." *Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 477 (7th Cir. 2024) (citing *Milchtein*, 42 F.4th at 822). According to the defendants, that is the case here.

The parties agree that a three-year statute of limitations applies to each claim asserted in the amended complaint. *See* MCW Defs.' Br. 7–8, ECF No. 44; Children's Defs.' Br. 5–6, ECF No. 47; and Pls.' Resp. 11, ECF No. 53. The Beines filed this action on March 20, 2025. Thus, to be timely, their claims had to accrue on or after March 20, 2022.

"A claim ordinarily accrues 'when [a] plaintiff has a complete and present cause of action.'" *Petrella v. MGM, Inc.*, 572 U.S. 663, 670 (2014) (quoting *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)). Therefore, claims under § 1983 generally accrue "'when a plaintiff knows the fact and the cause of an injury'"—in other words, when "the plaintiff knows or should know that his constitutional rights were violated." *Cielak*, 112 F.4th at 477 (first quoting *Amin Ijbara Equity Corp.*, 860 F.3d at 493; then citing *Towne v. Donnelly*, 44 F.4th 666, 670–71 (7th Cir. 2022)). In Wisconsin, tort claims accrue "on the date the injury is discovered or with reasonable diligence should [have been] discovered, whichever occurs first." *John Doe 1 v. Archdiocese of Milwaukee*, 2007 WI 95, ¶ 20, 734 N.W.2d 827, 835 (quoting *Hansen v. A.H. Robins Co.*, 335 N.W.2d 578, 583 (Wis. 1983)).

The amended complaint sets out a clear timeline of relevant events. On November 21, 2020, the Beines took P.B. to Children's Wisconsin, where he was examined by Dr. Levas and subjected to various tests, including an x-ray that Dr. Boyd interpreted. *See* Am. Compl. ¶¶ 36–55. Hospital staff referred the potential child abuse incident to its child advocacy team, which

was led by APNP Lisko and APNP Bretl. *See id.* ¶¶ 45–47, 60–62. Based on her review of the available medical records, Lisko concluded that P.B. had been physically abused, and Dr. Petska signed off on that conclusion. *See id.* ¶¶ 60–95. Hospital staff referred the matter to the police, who arrested Mr. Beine that same day at the hospital. *Id.* ¶¶ 48–59. On December 15, 2020, Mr. Beine was charged with felony child abuse. *Id.* ¶ 98.

Hospital staff also referred the matter to child protective services. *See* Am. Compl. ¶¶ 113–16. CPS examined P.B. at the hospital on November 21, 2020, and monitored the Beines for several weeks thereafter. *Id.* ¶¶ 113–19. During CPS's involvement, Ms. Beine was not allowed to see P.B. unsupervised, and Mr. Beine was prohibited from caring for or having unsupervised physical contact with P.B. Meanwhile, P.B. underwent follow-up tests on November 30, 2020, and December 14, 2020. *See id.* ¶¶ 130–32. Dr. Plunk performed a second skeletal survey on December 14 and concluded that imaging remained concerning for suspected child abuse. *Id.* ¶¶ 99–101. Based on those findings, on December 15, 2020, Lisko authored a follow-up report in which she stood by her initial assessment that P.B. had been physically abused. *Id.* ¶¶ 102–04. Again, Dr. Petska signed off on Lisko's report. *Id.* ¶ 105. After reviewing the follow-up testing, CPS determined that the allegations of physical abuse by Mr. Beine were unsubstantiated. *Id.* ¶¶ 119–24. CPS closed its investigation in January 2021.

The defendants insist that these allegations clearly establish that the Beines knew or should have known the fact and the cause of their injuries no later than January 2021, when CPS finished its investigation and determined that no child abuse had occurred; I agree. The amended complaint alleges that the defendants' unconstitutional and tortious acts caused several injuries, including the temporary deprivation of a familial relationship with P.B.,

emotional distress, the denial of career opportunities, and reputational harm stemming from the false allegation of child abuse. *See* Am. Compl. ¶¶ 208–72. According to the amended complaint, those acts inflicted a cognizable injury almost immediately: hospital staff reported suspected child abuse on November 21, 2020; Mr. Beine was arrested later that day and charged with felony child abuse on December 15, 2020; CPS placed restrictions on the Beines' interactions with their young son during its investigation, which concluded in January 2021; and, after Mr. Beine was charged, the family expended costs complying with the CPS restrictions, obtaining counsel, and attempting to seek second opinions. The Beines therefore had complete and present causes of action by the end of January 2021, at the latest.

Although the Beines concede that they "had knowledge of their injury at the time their infant son was taken away from them and Mr. Beine was arrested for felony child abuse charges," they argue that they "did not know *who and how* those injuries were caused until medical professionals reviewed P.B.'s records." Pls.' Resp. 13 (emphasis added). The Beines' statute-of-limitations argument seeks to take advantage of the so-called discovery rule, which "'tolls the statute of limitations until the plaintiff discovers or with reasonable diligence should have discovered that he or she has suffered actual damage due to wrongs committed by a particular, identified person.'" *John Doe 1*, 2007 WI 95, ¶ 21, 734 N.W.2d at 835 (quoting *Pritzlaff v. Archdiocese of Milwaukee*, 533 N.W.2d 780, 785 (Wis. 1995)). "Until that time, plaintiffs are not capable of enforcing their claims either because they do not know that they have been wronged, . . . or because they do not know the identity of the person who has wronged them." *Pritzlaff*, 533 N.W.2d at 785 (citations omitted). According to the Beines, the amended complaint alleges "several dates of discovery where information related to Defendants' misconduct and illegal acts were discovered by experts in the medical field." Pls.'

Resp. 13 (citing Am. Compl. ¶¶ 145–78). They identify three such dates: (1) April 18, 2022, when Dr. Gootnick issued her report about a potential bone disease; (2) June 8, 2022, when Dr. Sullivan issued his report about a potential bone disease; and (3) December 6, 2022, when Dr. Sorrentino issued her report and diagnosed spondylometaphseal dysplasia. *Id.* The Beines further note that the amended complaint alleges they didn't learn P.B.'s injuries were caused by his bone disorder until December 6, 2022. *Id.* (citing Am. Compl. ¶ 174).

The Beines' invocation of the discovery rule does not breathe new life into their claims. The only reasonable inference that can be drawn from the amended complaint's allegations is that, as of January 2021, the Beines knew that they had been injured by hospital staff. According to the amended complaint, the Beines brought P.B. to Children's Wisconsin on November 21, 2020, for a medical examination. That same day, CPS launched its investigation, CPS placed restrictions on the Beines' relationship with P.B., and the police arrested Mr. Beine. Hospital staff examined P.B. again on November 30, 2020, and December 14, 2020. The fact that Ms. Beine started conducting her own research shortly after her husband was charged in December 2020 shows that the Beines believed at that time that the allegations of abuse were wrong. *See* Am. Compl. ¶ 133 (alleging that Ms. Beine started doing her own research because the defendants "refused to consider alternative hypotheses related to bone disease"). Likewise, it's inconceivable that the Beines wouldn't have had access to the medical records showing who was responsible for their injuries; in fact, it appears the Beines provided those records to others when searching for a second opinion, *see id.* ¶¶ 133–78. In other words, while the information the Beines learned from medical experts in 2022 may have confirmed their belief as to the cause of P.B.'s injuries, that information did not unearth *a new injury to Mr. or Ms. Beine or a new wrongdoer*. *See Claypool v. Levin*, 562 N.W.2d 584, 590 (Wis.

1997) (explaining that the discovery rule "does not require that the potential plaintiff know with certainty the cause of her injury"); *Lewis v. Paul Revere Life Ins. Co.*, 80 F. Supp. 2d 978, 1006 (E.D. Wis. 2000) ("The discovery rule insures that the limitations period will not begin to run on plaintiffs who reasonably do not know or are unsure about whether they have been injured. It does not toll the beginning of the limitations period until plaintiffs have completed research into their potential causes of action for a known injury.").

Enforcing a statute of limitations is not about playing "gotcha," it is about protecting defendants and the courts from "having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *United States v. Kubrick,* 444 U.S. 111, 117 (1979). The plaintiffs' broad reading of the discovery rule would place almost unlimited control of the accrual of injury claims in the hands of plaintiffs, extending the life of such claims essentially indefinitely while plaintiffs seek out supportive expert opinions, which presumably could be obtained without great difficulty even years or decades after the limitations period otherwise would have expired. Such a regime would be unfair to defendants and would result in the litigation of stale claims. *Samuel v. Gov't of V.I.,* No. CIV 2002/61, 2006 WL 3613257, at *8 (D.V.I. Nov. 22, 2006) ("the appellant's argument would turn the discovery rule and the statutes of limitations on their head by permitting actions for an indefinite period of time after the actual injury, so long as an expert opinion is not obtained."); *Tripo v. Robert Wood Johnson Med. Ctr.,* 845 F. Supp. 2d 621, 629–30 (D.N.J. 2012) ("although Plaintiff may not have learned that he had a legal cause of action against Defendants until he received the expert report in March 2011, the discovery rule does not toll the accrual date until a claimant knows that he has a legal cause of action against a particular defendant.")

## CONCLUSION

Because the Beines' allegations clearly establish that they knew or should have known both the alleged injurious conduct and the identity of their wrongdoers more than three years before they filed suit, all their claims are untimely. Accordingly, for all the foregoing reasons, the court **GRANTS** the defendants' motions to dismiss the amended complaint, ECF Nos. 43 & 45, and **DENIES as moot** the defendants' motions to dismiss the original complaint, ECF Nos. 27 & 33. The clerk of court shall enter judgment that this entire action is **dismissed with prejudice** and that the Beines shall take nothing from any of the defendants by their amended complaint.

**SO ORDERED** this 8th day of January, 2026.



STEPHEN C. DRIES
United States Magistrate Judge

## CERTIFICATION

I hereby certify that all the materials required by Circuit Rules 30(a) and 30(b) are included in both the digital version of the Appendix to this brief and the Appendix bound with this brief.

Dated this 26th day of March, 2026.

/s/ Nicole M. Masnica
NICOLE M. MASNICA